Edward J. Kuriansky, as Deputy Attorney-General for Medicaid Fraud Control, et al., Respondents, v Bed-Stuy Health Care Corporation et al., Appellants, et al., Defendant.

Second Department, February 16, 1988

### APPEARANCES OF COUNSEL

*Hoffinger Friedland Dobrish Bernfeld & Hasen (Mark W. Geisler, Leon B. Polsky* and *Stephen L. Weiner* of counsel), for Bed-Stuy Health Care Corporation and others, appellants.

*Mudge Rose Guthrie Alexander & Ferdon (Jed S. Rakoff, Howard W. Goldstein, Martin L. Feinberg* and *James I. Glasser* of counsel), for Jay E. Weinberg, appellant.

*Edward J. Kuriansky, Deputy Attorney-General for Medicaid*

*Fraud Control (Arthur A. Munisteri, Donald Zuckerman* and *Elizabeth T. Bogren* of counsel), respondent *pro se,* and for State of New York, respondent.

### OPINION OF THE COURT

Spatt, J.

This case concerns the new and rapidly developing field of the law of "forfeiture". In this civil action, the plaintiffs the State of New York and the Deputy Attorney-General for Medicaid Fraud Control (hereinafter the claiming authority) seek, *inter alia,* to recover damages arising from an alleged fraudulent scheme to improperly obtain public funds under the State Medicaid program. Simultaneous with the prosecution of criminal charges against the defendants Bed-Stuy Health Care Corporation (hereinafter Bed-Stuy), Ronald Weinberg, Sheldon Weinberg and Jay E. Weinberg (hereinafter the criminal defendants), this civil action was commenced under CPLR article 13-A to declare the forfeiture of the proceeds of the crimes for which these defendants were indicted, and pursuant to Social Services Law § 145-b, to recover treble damages in the sum of $39,000,000 claimed to be resulting from the alleged fraud.

■■■ On this appeal, we are called upon to determine (1) whether the Supreme Court properly granted the plaintiffs' request for the imposition of provisional remedies against certain assets of the defendants, (2) whether the imposition of such relief effectively deprived those defendants subject to criminal charges of their constitutional right to obtain paid counsel of their own choosing by virtue of the freezing of their assets, and (3) whether the court erred in directing the criminal defendants to disclose certain financial information in violation of their constitutional right against self-incrimination. For the reasons which follow, we conclude that affirmance is warranted as to criminal defendants Bed-Stuy and Sheldon Weinberg and noncriminal defendants Roslyn Weinberg and Presidential Limousine, Inc. (hereinafter Presidential). With regard to the criminal defendant Jay Weinberg, we remit to the Supreme Court for further consideration under the rules set forth herein.

## I

Initially, we review the relevant statutes underlying this appeal.

CPLR article 13-A, effective August 1, 1984, authorizes District Attorneys and the Attorney-General, as claiming authorities, to recover, as against the criminal defendants, real property, personal property, money, negotiable instruments, securities or other items of value, which constitute the proceeds, substituted proceeds or instrumentalities of crime, or to recover a money judgment in an amount equivalent in value to the property which constituted the proceeds of the crime, the substituted proceeds or an instrumentality of crime (CPLR 1311 [1]). A civil forfeiture action may be commenced and provisional remedies, such as attachment, may be obtained prior to a conviction, but no actual forfeiture or money judgment may be recovered until after a conviction. In fact, the civil action is stayed during the pendency of the criminal proceeding, but the stay does not prevent the granting of provisional remedies (CPLR 1311 [1] [a]).

The crimes upon which a forfeiture action may be based are of two types: (1) postconviction forfeiture crimes, meaning any felony as defined under the Penal Law or other chapter of the consolidated laws (CPLR 1310 [5]); and (2) preconviction forfeiture crimes which are drug-related crimes (CPLR 1310 [6]) not involved in this case. The criminal defendants in this case have been indicted for crimes under the postconviction forfeiture crime category, permitting the claiming authority to commence this forfeiture action and obtain provisional remedies, including attachment, prior to conviction. The statutory plan also permits an action against the noncriminal defendants with recovery limited to the proceeds, substituted proceeds or instrumentalities of the crime.

Under CPLR 1312, the provisional remedies of attachment, injunction, receivership and notice of pendency are available upon the court's determination that the following three-pronged standard is satisfied: (1) there is a substantial probability that the claiming authority will prevail on the issue of forfeiture; (2) failure to enter the order may result in the property being destroyed, removed from the jurisdiction of the court or otherwise unavailable for forfeiture, and (3) the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order may operate.

CPLR 1326 permits the court to order disclosure at any time after the granting of an order of attachment upon motion of "any interested person" for information regarding any property in which the defendant may have any interest or

to whom debts may be owed. In this case, the court order at issue directed the criminal defendants Sheldon Weinberg, Ronald Weinberg and Jay Weinberg to each execute and deliver to the claiming authority a sworn financial disclosure statement and signed authorizations, permitting the claiming authority to obtain their Federal and State tax returns and other financial information. The order also states that it "shall not prevent the invocation of the self-incrimination privilege as to any information sought by [the financial disclosure form]".

The forfeiture statute provides a number of safeguards designed to protect the defendants from an improper deprivation of their property as a result of provisional remedies. If a defendant recovers judgment or succeeds in proving, by the preponderance of the evidence, that the claiming authority acted without reasonable cause and not in good faith in securing the provisional remedy, the claiming authority is liable for "all costs and damages, including reasonable attorney's fees, which may be sustained by reason of the attachment" (CPLR 1318 [4]; 1337).

Other significant safeguards are contained in CPLR 1329, which permits a defendant to move to vacate or modify an order of attachment, and CPLR 1336, which permits a defendant to "move at any time" to vacate or modify a preliminary injunction or temporary restraining order.

With regard to the cause of action by the State, Social Services Law § 145-b provides that it is unlawful to fraudulently obtain payment from public funds for medical services purportedly furnished. The statute further provides that "the state shall have a right of action to recover civil damages equal to three times the amount by which any figure is falsely overstated" (Social Services Law § 145-b [2]). Provisional relief is available to the State in an action under the Social Services Law pursuant to CPLR articles 62 and 63.

Finally, CPLR 6201 sets forth the grounds for the nonforfeiture provisional remedy of attachment. The ground justifying attachment relevant to this appeal is subdivision (3) of CPLR 6201 which provides that an order of attachment may be granted if it is shown that "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts".

## II

Bed-Stuy is a diagnostic and treatment center licensed pursuant to Public Health Law article 28, operating at two sites in Brooklyn. As an article 28 diagnostic and treatment center, Bed-Stuy was entitled to charge the State's Medicaid program a fixed fee for each visit a Medicaid recipient made to the facility, regardless of the number or nature of the procedures performed during the visit. Sheldon Weinberg is its president and 94% shareholder; his wife, noncriminal defendant Roslyn Weinberg, is the corporate secretary and owns the remaining shares. It is alleged that their sons, Jay Weinberg and Ronald Weinberg, were the licensed administrators of Bed-Stuy and supervised its day-to-day operation.

By Kings County indictment No. 6319/87, the criminal defendants were charged with grand larceny in the first degree, conspiracy in the fourth degree, offering a false instrument for filing in the first degree (37 counts), and falsifying business records in the first degree (26 counts). These charges arose from an alleged fraudulent scheme which commenced in or about 1980, and continued to 1987, whereby claims for reimbursement were submitted to the State Medicaid program for thousands of patient visits that never actually occurred. According to the State authorities, by a conservative estimate, the aggregate proceeds of these crimes is in the total sum of at least $13,000,000. Also, by a separate pending indictment (Kings County indictment No. 6244/87), Jay Weinberg and a codefendant were charged with committing arson with regard to a fire at the Bed-Stuy Fulton Street location which destroyed many of the clinic's medical records.

On August 4, 1987, the plaintiffs obtained an order to show cause containing an ex parte temporary restraining order based upon (1) the claiming authority's motion for provisional remedy relief under CPLR article 13-A to restrain the criminal defendants' assets to the extent of $13,000,000, and (2) the State's motion under CPLR articles 62 and 63 for a provisional order of attachment and a preliminary injunction to restrain all of the defendants' assets to the extent of $39,000,000. The claiming authority also sought, pursuant to CPLR 1326, disclosure of information concerning all of the defendants' finances and properties.

Upon application of the criminal defendants, by order dated August 7, 1987, the court modified the temporary restraining order to the extent that aggregate funds in the amount of

$1,400,000 were released to enable the posting of bail. By further order dated August 27, 1987, the temporary restraining order was again modified to the extent of releasing additional funds to permit the payment of certain utility bills.

Thereafter, following extensive oral argument, the Supreme Court granted the plaintiffs' motion for provisional remedies and disclosure. Preliminarily, the court noted: "In an attempt to reach an accommodation between the parties, the Court met with counsel in excess of five hours, exploring possible solutions in order to preserve the assets restrained, and of the claimed hardship of the defendants. In view of the intransigence of the parties, the refusal of the defendants to supply disclosure of their assets under oath, and the plaintiffs refusal to release assets without full disclosure, no accommodation was reached".

The court then concluded that the plaintiffs had sufficiently established the prerequisites for the provisional remedies pursuant to CPLR articles 13-A, 62 and 63. Additionally, although the court recognized that a hardship to the defendants might exist as a result of the restraint on their assets, it emphasized that "the defendants' failure to come forward with sworn financial disclosure leaves this Court without sufficient information to ascertain the extent of that hardship".

## III

With the exception of Ronald Weinberg, all of the defendants have appealed from this order claiming, in essence, that CPLR article 13-A is unconstitutional both facially and as applied under the circumstances of this case. In order to resolve these issues, we begin our analysis with *Morgenthau v Citisource, Inc.* (68 NY2d 211), the first case to reach the Court of Appeals involving the statutory scheme embodied in CPLR article 13-A. In discussing the purpose underlying the enactment of article 13-A, Judge Alexander, speaking for a unanimous court, noted that the Legislature's objective was " 'to take the profit out of crime' " *(Morgenthau v Citisource, Inc., supra,* at 217), and accordingly concluded that: "the availability of provisional remedies serves the substantial governmental need of preventing the judicial process from being frustrated by the dissipation of assets that will potentially satisfy a civil judgment" *(Morgenthau v Citisource, Inc., supra,* at 221).

In response to the defendants' constitutional challenge to the statutory scheme, the court held, *inter alia,* that the procedures provided in article 13-A satisfy minimum procedural due process requirements *(Morgenthau v Citisource, Inc., supra,* at 221). The court further noted that article 13-A contains provisions for "an elaborate array of safeguards" carefully drafted "to protect defendants from an erroneous deprivation of their property through the imposition of a provisional remedy" *(Morgenthau v Citisource, Inc., supra,* at 222). These safeguards include placing a substantial burden upon the claiming authority to establish in the first instance the need for an attachment and a continuing burden to demonstrate the need for maintaining the levy *(see,* CPLR 1317 [2]; 1329 [2]; *see also,* CPLR 1318 [4]; 1337). Additionally, the court pointed out that to accommodate the potential changing circumstances of the defendant pending a final disposition of the forfeiture action, article 13-A provides the following significant safeguards: "[T]he defendant may move at any time to either discharge the attachment (CPLR 1328) or to vacate or modify the attachment (CPLR 1329) and the court may, on its own motion, dismiss the entire action in the interests of justice if it finds such relief warranted by the existence of some compelling factor, consideration or circumstance demonstrating that forfeiture would not serve the ends of justice (CPLR 1311 [4])" *(Morgenthau v Citisource, Inc., supra,* at 222).

In this case, we must address additional issues in the civil forfeiture field. Measured by the statutory standards as interpreted by *Citisource (supra),* we find, contrary to the criminal defendants' contentions, that in this case the Supreme Court was justified in granting provisional remedy relief except as to the defendant Jay Weinberg. As to all of the defendants, the claiming authority satisfied its initial statutory burden of demonstrating that (1) there is a substantial probability that there would be a conviction in the underlying criminal proceedings so that the claiming authority would thus prevail on the substantive issues of forfeiture, and (2) the failure to enter the order may result in the property being destroyed, removed from the jurisdiction or otherwise unavailable for forfeiture. The third prong of the predicate threshold required the court to balance the need to ensure the availability of the property as against the hardship on any party against whom the order may operate (CPLR 1312 [3]). For the reasons that follow, we hold that the claiming author-

ity sustained its burden as to the third prong as to all the criminal defendants except Jay Weinberg.

We further conclude that the provisional remedy relief granted by the court "serves the substantial governmental need of preventing the judicial process from being frustrated by the dissipation of assets" *(Morgenthau v Citisource, Inc., supra,* at 221). In our view, the governmental need to preserve available assets is particularly appropriate in this case where the profits of the criminal defendants' alleged crimes are misappropriated public funds which can potentially be restored to the taxpayers.

## IV

In support of its burden to establish the substantial probability that it will prevail on the issue of forfeiture, namely, that there will be a conviction in the underlying criminal proceedings, the claiming authority submitted, *inter alia,* the indictment against the criminal defendants and an affidavit of Bernice Polinsky, the Senior Special Auditor Investigator in the Office of the Deputy Attorney-General for Medicaid Fraud Control, which provided detailed information concerning the investigation conducted by the claiming authority. This affidavit related with specificity the investigative activities of the special auditor including interviews with Dr. David Beldengreen, an alleged coconspirator; examination of Dr. Beldengreen's bank account which allegedly corroborated his claim that he shared in the proceeds gained by the false billings; interviews with employees of Bed-Stuy including computer operators; interviews with 100 randomly selected Medicaid recipients; interviews with other recipients who have relocated; interviews with physicians who were employed by Bed-Stuy; and interviews with employees of Dataline Services, Inc., the computer billing service that Bed-Stuy hired to process its Medicaid claims. This investigation revealed that the criminal defendants had engaged in a long-term fraudulent scheme whereby invoices were created for patient visits at the facilities of Bed-Stuy that never, in fact, occurred. The fraudulent claims were then submitted for reimbursement under the Medicaid program.

This information was initially elicited from Dr. Beldengreen, a named accomplice who ultimately pleaded guilty to certain charges, including a charge of grand larceny in the third degree under a New York County superior court infor-

mation which allegedly involved his participation in the Bed-Stuy conspiracy. Moreover, according to the affidavit of the special investigator, numerous employees of the health care facility, certain Medicaid recipients who had claims submitted on their behalf, as well as other individuals, corroborated the information provided by the named accomplice. The investigation further revealed that noncriminal defendant Roslyn Weinberg was entitled to a draw from Bed-Stuy equal to that of her husband by virtue of her position as secretary of the corporation and that moneys were traced from Bed-Stuy to Presidential's operating account. Further corroboration was based upon a review of documents including records of the Department of Social Services, the independent computer billing service used by the defendant corporation and from records furnished by the accomplice. Contrary to the defendants' contentions, the indictment and the affidavits do not contain vague or conclusory allegations; rather, they provide detailed factual information as to the pervasiveness of the criminal defendants' alleged scheme to defraud, albeit based in substantial part on hearsay.

We also note that none of these factual allegations concerning this fraudulent scheme were controverted by any party having personal knowledge. In his affidavit dated August 17, 1987, the attorney for the defendant Jay Weinberg stated that Mr. Weinberg was prepared to submit to the Supreme Court, in camera, a sworn affidavit specifically denying the "false accusations" against him. No such document was furnished. We therefore agree with the Supreme Court that, based upon the papers submitted, the claiming authority sufficiently demonstrated the substantial probability that it would succeed on the merits of the forfeiture action by obtaining convictions on the criminal charges.

The defendants' contention that their due process rights were violated because the Supreme Court failed to conduct a hearing is without merit. Although no evidentiary hearing was held, this was not an ex parte procedure. The court heard extensive argument and the defendants were given an opportunity to submit affidavits and memoranda of law. The submissions of counsel did not raise factual issues with regard to the substantive elements of the charged crimes. In *Dillon v Schiavo* (114 AD2d 924, *lv dismissed* 67 NY2d 605), in rejecting the defendant's claim of a due process violation, the court held:

"Defendant's argument is unavailing. Upon a motion to

confirm an ex parte order of attachment, the plaintiff is required to establish the grounds for the attachment, the need for continuing the levy and the probability that he will succeed on the merits (see, CPLR 1317 [2]; 1329 [2]). The record amply demonstrates that this was done.

"The requirements of due process guarantee no particular form of procedure but are designed to protect substantial rights *(see, Mitchell v Grant Co.,* 416 US 600). In a proper case, as where the averments of the parties reveal the facts to be disputed, a court may order the examination of witnesses *(see, e.g., Long Is. Trust Co. v Porta Aluminum Corp.,* 44 AD2d 118). *However, at bar, the factual contents of plaintiff's submissions were not disputed by defendant. Accordingly, Special Term did not abuse its discretion by not holding a postattachment adversarial hearing" (Dillon v Schiavo, supra,* at 925-926 [emphasis supplied]).

## V

We also find that the failure to grant an attachment order "may result" in the dissipation of the identified assets (CPLR 1312 [3]), and that the State sufficiently demonstrated that the defendants, with intent to defraud, were about to dispose of certain assets (CPLR 6201 [3]). The affirmation of Elizabeth T. Bogren, Special Assistant Attorney-General, based upon interviews with doctors employed at Bed-Stuy and past and present employees, reveals that the Weinbergs were attempting to sell the Bed-Stuy Health Care Corporation and its facilities. It was also learned from the Department of Social Services that Bed-Stuy's billings to Medicaid plummeted from $234,000 per week in early June 1987, to $22,000 per week by the end of the same month. Further, Jay Weinberg is married to a South African national and has substantial business interests and investments in South Africa.* The request for provisional relief also included assertions that Jay Weinberg had been convicted of grand larceny in the second degree and insurance fraud and passing a bad check; that he was on probation for the grand larceny conviction; that he was under indictment for failure to file State tax returns for three years; and that he had recently asked the court presiding over the tax case to return his passport which he had surrendered. As a predicate felon, this defendant faces impris-

* Jay Weinberg states that he and his wife are now separated.

onment of a mandatory minimum term of 4½ to 9 years *(see,* Penal Law §§ 155.42, 70.06).

In addition, most of the defendants' assets are outside the State of New York, including a home and personal property owned by defendants Sheldon Weinberg and Roslyn Weinberg in Boca Raton, Florida. Jay Weinberg's contract with Nedbank of South Africa, by whom he is employed as a consultant in bond trading, provides that his commission be paid directly to an account located in Chicago. Further, a fire occurred at a Bed-Stuy location in October 1983 which destroyed its records, as a result of which Jay Weinberg has been charged with arson. The record further reveals that the defendants Sheldon Weinberg and Roslyn Weinberg state that their living expenses are approximately $29,000 per month, or approximately $356,000 per year, including $14,000 per month rent for their apartment in New York and approximately $7,000 per month as carrying charges on their Florida home. Their son Jay Weinberg states that his own living expenses are in excess of $12,000 per month, or approximately $144,000 per year. Given the conceded substantial living expenses of the defendants, without supervision of the court the present available assets in New York are in real danger of being dissipated prior to the final disposition of this action. These facts not only support the claiming authority's request for an attachment, but also buttress its claims for a receivership and injunctive relief *(see,* CPLR 6301).

VI

Finally, we must determine whether the claiming authority has established the third prong; namely, that the need to preserve the availability of the property outweighs the hardship on any party. In this phase, we will also consider the significant constitutional issues raised by the defendants concerning the right to counsel and the privilege against self-incrimination which are intertwined in the granting of provisional remedy relief and the order for financial disclosure. In our review of this balancing prong, we must also take into consideration the substantial claimed fraudulent proceeds in the sum of approximately $13,000,000 and the claimed treble damages to the State of $39,000,000. Although the defendants contend that the provisional remedies effectively freeze all of their assets thereby preventing them from paying their necessary expenses, with the exception of Jay Weinberg, the record

does not contain any meaningful affidavits from the defendants revealing their financial status. On August 14, 1987, Jay Weinberg's attorney delivered a letter to the Special Assistant Attorney-General which listed (1) the assets of Jay Weinberg which had been frozen, and, significantly, (2) "Mr. Weinberg's other assets". Although the language could have been more explicit, the latter category could be reasonably interpreted as a listing of *all* the remaining assets of Jay Weinberg. In his own affidavit dated August 21, 1987, Jay Weinberg made the following statement under oath: "I authorized my attorneys to draft a plan which disclosed my assets and itemized my expenses while preserving my Fifth Amendment rights. I read the plan before and after it was sent to Assistant Attorney General Bogren. I affirm the truth of the contents of the plan and adopt the plan by reference. A copy of the plan is attached hereto as Exhibit A."

▮ Notwithstanding this financial disclosure by the defendant Jay Weinberg, the Supreme Court declined to determine whether the need to preserve the availability of the property outweighed the hardship to Jay Weinberg solely on the ground that he failed to come forward with sworn financial disclosure. Therefore, this matter must be remitted for such consideration as to the third prong.

The two affidavits referred to were sufficient to trigger the balancing procedure, which was not done. While the principle of law enunciated by the Supreme Court was correct in that financial disclosure was required before the court could determine the hardship issue, including the right to counsel, the rule was not correctly applied in the case of Jay Weinberg. Presented with the financial disclosure by this defendant and fortified by an evidentiary hearing on this issue, if required, the court may determine to modify the attachment and injunction so as to release moneys for counsel fees or other reasonable necessary expenses. Lest there be confusion and as discussed in greater detail herein, this ruling does not modify the proper discovery order, pursuant to CPLR 1326, entered by the Supreme Court.

▮ With regard to the remaining defendants, we note that the Supreme Court's attempts to weigh the conflicting needs of the parties as well as to safeguard their competing interests ultimately proved unsuccessful because of their refusal to submit affidavits or other proof detailing the full extent of their assets. Having provided no evidence of their financial condition, neither the Supreme Court nor this court is in a

position to determine whether the remaining defendants are being deprived of the right to paid counsel of their choice.

## A

We now address the defendants' contention that the entry of the order of attachment and other provisional relief violated their right to counsel. The Sixth Amendment right to counsel includes a right to retain counsel of choice by one who is financially able to do so *(see, e.g., United States v Curcio,* 694 F2d 14, 22-23 [2d Cir 1982]; *United States v Burton,* 584 F2d 485, 489 [DC Cir 1978], *cert denied* 439 US 1069). However, the right to counsel of choice is qualified and can be outweighed by countervailing governmental interests *(see, e.g., United States v Paone,* 782 F2d 386, 392 [2d Cir 1986], *cert denied* — US —, 107 S Ct 3261 [1987]), or "when required by the fair and proper administration of justice" *(United States v Ostrer,* 597 F2d 337, 341; *In re Grand Jury Subpoena Served Upon Doe,* 781 F2d 238, 250-251 [en banc], *cert denied sub nom. Roe v United States,* 475 US 1108).

In interpreting the Federal Comprehensive Forfeiture Act (21 USC § 853 [e] [1] [A]), the Federal courts have also wrestled with this complex problem with varying results. In *United States v Caplin & Drysdale* (837 F2d 637, 644-645 [4th Cir, Jan. 11, 1988 (en banc)]) the Fourth Circuit overruled the holding of *United States v Harvey* (814 F2d 905) and held that "The very point of the inclusion of forfeiture in an indictment is the government's assertion that the assets possessed by a defendant are not legally his own, but the fruits of crime in which the law recognizes no ownership rights of the defendant. Forfeiture is not an attempt to punish those with legal assets by denying them an attorney * * * The right to counsel of choice belongs only to those with legitimate assets. The right to counsel does not guarantee that every defendant will have the lawyer he desires" *(but see, United States v Nichols,* 654 F Supp 1541, 1558). By contrast, the Second Circuit recently held that the indictment alone was insufficient to support forfeiture of assets needed to retain counsel. Emphasizing the government's interest in restraining assets subject to forfeiture and mindful of the "impermissible substitution of judicial policy for Congressional policy," Judge Mahoney writing for the majority in *United States v Monsanto* (836 F2d 74, 81 [2d Cir, Dec. 21, 1987], *reh granted en banc,* Jan. 29, 1988), opted for a reasonable compromise and directed a

postrestraining adversarial hearing with respect to forfeiture-related restraining orders. At such a hearing, the government bears the burden of demonstrating, by evidence independent of the indictment, a probability that they will prevail at the trial as to the criminal liability and the issue of forfeiture.

A review of the Federal forfeiture statute indicates material differences from our CPLR article 13-A forfeiture. For example, title to property subject to forfeiture vests in the United States upon commission of the crime; after indictment, restraining orders may be issued on the sole basis of the indictment's allegation that the property would be subject to forfeiture upon conviction; and the issue of forfeiture is tried as part of the criminal action and is decided by the same jury that decides the guilt or innocence of the defendant (21 USC § 853 [c], [e] [1] [A]). Furthermore, the Federal statute contains a postconviction "relation back" provision, 21 USC § 853 (c), which allows the government to seek postconviction forfeiture of property transferred to a third person, including the legitimate fees paid to the attorneys representing the defendant in the criminal charges.

In contrast, the New York forfeiture proceeding is a separate civil action not directly connected to the criminal proceeding. The New York statute provides for attachment of the property after indictment and for forfeiture only after conviction. Also, in order to obtain a provisional remedy, the claiming authority must establish, with an evidentiary showing, that there is a substantial probability that there will be a conviction. On the other hand, the Federal statute has no provision for preattachment judicial evaluation of the strength of the government's case as to guilt, or dissipation of the assets, or hardship. Furthermore, the "relation back" provision of the New York statute only permits forfeiture against third parties in limited circumstances (CPLR 1311 [3] [b] [ii]). No court has held that the New York statute permits a claiming authority to reach legitimate paid attorney's fees.

Given these substantial differences between the two statutes, the Federal cases on forfeiture and right to counsel must be considered but cannot be given conclusive effect.

Although the New York Court of Appeals recognized that under CPLR article 13-A "a factual scenario may arise where the pre-conviction attachment of a defendant's assets will infringe the ability to hire chosen counsel" *(Morgenthau v Citisource, Inc.,* 68 NY2d 211, 223, *supra),* the record in this

case does not present sufficient evidence to determine either the defendants' financial net worth or their actual ability to hire counsel of their choice. Stated simply, with the exception of the defendant Jay Weinberg, the defendants' intentional failure to make an appropriate record before the Supreme Court as to their true financial condition prevented that court from evaluating the conflicting needs of the parties, including any hardship to the defendants and the alleged but unsubstantiated denial of their right to counsel. Given the state of the record and with the issue thus limited, this court cannot properly review the defendants' deprivation of counsel claim *(see, e.g., United States v Gelb,* 826 F2d 1175, 1176-1177).

We agree with the Supreme Court that in the absence of sufficient financial disclosure, the court cannot ascertain and balance any hardship suffered by a defendant, including the deprivation of counsel of his choice. In the case of Jay Weinberg, however, there has been sufficient financial disclosure so as to raise this issue. We therefore remit to the Supreme Court to determine the third prong in a manner best suited for a fair evaluation, including, if necessary, a hearing related only to this issue, namely, whether the need by the plaintiffs to preserve the available property outweighs the hardship to Jay Weinberg.

### B

■ Addressing the third and final constitutional issue raised, we find no merit in the defendants' contention that the disclosure order imposes an unconstitutional sanction by forcing them to face self-incrimination in order to obtain a release of their assets *(see, United States v Rylander,* 460 US 752, *reh denied* 462 US 1112; *United States v White,* 589 F2d 1283; *cf., e.g., Baxter v Palmigiano,* 425 US 308; *Lefkowitz v Cunningham,* 431 US 801).

In this self-incrimination issue, we confront the ever-increasing situation involving parallel criminal proceedings and civil actions forcing defendants to choose whether to testify in the civil action or, as in this case, whether to consent to disclosure in the civil action. The Fifth Amendment of the US Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself", and it has been held that the privilege is violated when "the accused is compelled to make a testimonial communication that is incriminating" *(Fisher v United States,* 425 US 391, 408). "[T]he

privilege is available to a witness in a civil proceeding, as well as to a defendant in a criminal prosecution" because the critical test is whether the testimony may subsequently subject a witness to criminal prosecution *(Lefkowitz v Cunningham, supra,* at 805; *Malloy v Hogan,* 378 US 1, 11). Thus, the United States Supreme Court has held that "when a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment and cannot be used against the declarant in a subsequent criminal prosecution" *(Lefkowitz v Cunningham, supra,* at 805; *see also, Lefkowitz v Turley,* 414 US 70; *Gardner v Broderick,* 392 US 273). In each of the above-cited cases the individual's choice not to testify resulted in a direct and automatic loss of a benefit.

The court order in this case compels the criminal defendants to furnish certain financial information in affidavit form and to sign authorizations permitting the claiming authority to obtain other data concerning their finances. Financial disclosure is an integral part of the statutory forfeiture plan *(see, e.g., Kuriansky v Natural Mold Shoe Corp.,* 133 Misc 2d 489, *rearg granted* 136 Misc 2d 684 [wherein the defendants were directed to appear and give testimony as to their financial status]).

As previously discussed, we agree with the Supreme Court that information concerning the full extent of the defendants' assets and financial condition is necessary in order to determine whether the freezing of their assets resulting from the imposition of the provisional remedies violates their right to obtain counsel of their choice. Although the defendants also contend that the disclosure order impermissibly forces them to choose between preserving their Fifth Amendment privilege and losing their right to obtain chosen counsel, it appears to us that they overstate their dilemma. It is pure speculation to conclude that by complying with the disclosure order, the defendants will necessarily incriminate themselves by supplying the State with evidence that may be used against them in the pending criminal prosecution. Also, the court order does not compel the defendants to abandon their privilege against self-incrimination. In fact, the record reveals that as to the required disclosure, the order expressly permits "the invocation of the self-incrimination privilege".

Contrary to the defendants' assertions, this case " 'does not smack of an invalid attempt by the State to compel testimony

without granting immunity or to penalize the exercise of the privilege' " *(Baxter v Palmigiano,* 425 US 308, 331, *supra).* The defendants cannot rely upon a line of United States Supreme Court cases holding that an individual may not be forced to choose between the risk of self-incrimination and the automatic forfeiture of public employment *(Gardner v Broderick, supra; Garrity v New Jersey,* 385 US 493) or disbarment *(Spevack v Klein,* 385 US 511), or cancellation of existing State contracts and ineligibility for further State contracts for five years *(Lefkowitz v Turley, supra).* In each of those cases, the individual's choice not to testify about his or her performance on the job *(Garrity v New Jersey, supra)* or his or her contractual relations with the State *(Lefkowitz v Turley, supra),* or their professional activities *(Spevack v Klein, supra),* resulted in their automatic loss of employment or eligibility to contract with the State or their license to practice law. These cases were subsequently distinguished in *Baxter v Palmigiano (supra),* in which the Supreme Court refused to extend the Griffin rule prohibiting an adverse inference of guilt to be drawn from a defendant's failure to testify in a criminal proceeding *(Griffin v California,* 380 US 609 [1965], *reh denied* 381 US 957), to an inmate disciplinary proceeding in a State prison. The court expressed its reasoning as follows:

"[T]his case is very different from the circumstances before the Court in the *Garrity-Lefkowitz* decisions, where refusal to submit to interrogation and to waive the Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State. There, failure to respond to interrogation was treated as a final admission of guilt. Here, Palmigiano remained silent at the hearing in the face of evidence that incriminated him; and, as far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case * * *

"Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them" *(Baxter v Palmigiano, supra,* at 318).

In New York, unlike the rule in a criminal case, a party's invocation of the privilege against self-incrimination in a civil case may be considered by the finder of the facts in assessing the strength of the evidence offered by the opposing party on

the issue which the witness was in a position to controvert *(see, Marine Midland Bank v Russo Produce Co.,* 50 NY2d 31).

A significant case in this area of parallel criminal proceedings and civil actions is *United States v White* (589 F2d 1283, *supra).* Relying in part upon the *Baxter* rationale, the court held that compelling a defendant to proceed to trial in a civil action while criminal charges arising from the same conduct were pending against him did not unconstitutionally force the defendant to choose between preserving his Fifth Amendment privilege and losing the civil suit. In reaching this conclusion, the court pointed out that "although [the defendant] may have been denied his most effective defense by remaining silent, there is no indication that invocation of the fifth amendment would have necessarily resulted in an adverse judgment" *(United States v White, supra,* at 1286).

Analogous to the circumstances at bar, the court in *United States v White (supra)* rejected a contention that the trial court in the civil proceeding effectively compelled a waiver of the defendant's right to remain silent by ordering him to respond to the plaintiff's motion for summary judgment, as follows: "[a]ny 'waiver' of the fifth amendment must be voluntary, but invocation of the privilege does not release defendant from any choice concerning the use of his or her testimony. The fifth amendment preserves the right to choose, and the voluntariness of the choice is always affected in some way by the exigencies of a particular situation. The voluntariness inquiry necessarily incorporates an understanding that defendant cannot be free from conflicting concerns, and in any case, defendant must weigh the relative advantages of silence and explanation. In the present case, the state court did not so unduly burden the employment of silence as to make the decision to testify involuntary" *(United States v White, supra,* at 1287).

Further, in the recent case of *Matter of New York City Commr. of Social Servs. v Elminia E.* (134 AD2d 501), in the context of a child abuse proceeding, this court rejected the mother's contention that her right against self-incrimination would be violated if she were required to proceed to trial in the Family Court proceedings prior to her trial under a pending indictment which charged her with having assaulted her child. We concluded that even though a statutory presumption of abuse or neglect was applicable against the mother in a civil proceeding placing a burden upon her to come forward with proof to rebut

the presumption, there was no violation of her right against self-incrimination *(see also, Matter of Germaine B.,* 86 AD2d 847; *Matter of Vance A.,* 105 Misc 2d 254).

Similarly, in the instant case, there is no automatic forfeiture of the defendants' property resulting from their failure to disclose information concerning their assets. The provisional remedies granted result in a "freezing" of defendants' assets and not a forfeiture. Their choice of whether to disclose in connection with the provisional remedies deals with an attachment rather than loss of their property. As in *Baxter,* the circumstances in this case are "very different from the circumstances before the Court in the *Garrity-Lefkowitz* decisions" *(Baxter v Palmigiano, supra,* at 318) and do not subject the defendants to the "potent sanctions" held to violate the privilege against self-incrimination. We therefore hold that the disclosure order directed in conjunction with the provisional remedy phase of this forfeiture action does not violate the Fifth Amendment.

While affirming in part the granting of the provisional remedies and disclosure by the Supreme Court, we also conclude that upon a sufficient evidentiary showing, the defendants may ultimately establish that the provisional remedy order should be modified or vacated, based on an evaluation and balancing of the conflicting needs of the plaintiffs to preserve the available property as opposed to proof of hardship by the defendants. In order to do so, however, disclosure of the requested financial information is required.

We have reviewed the defendants' remaining contentions and find them to be without merit.

Accordingly, the order appealed from is modified to remit this proceeding to the Supreme Court with regard to the defendant Jay E. Weinberg to make the determination as to hardship heretofore discussed, and should otherwise be affirmed.

WEINSTEIN, J. (concurring in part and dissenting in part). While I concur in the scholarly and erudite opinion of Justice Spatt with regard to all remaining matters, I respectfully take issue with his decision to remit the proceeding to the Supreme Court with respect to the defendant Jay E. Weinberg for the purpose of making a determination concerning the hardship issue. In my view, the equivocal submissions of this defendant and his attorney fall far short of the sworn financial disclosure required by the court. Although the majority has con-

ceded that the letter delivered by Mr. Weinberg's attorney "could have been more explicit" in its language, it chose to take the view that the writing "could be reasonably interpreted as a listing of *all* the remaining assets of Jay Weinberg" *(supra,* at 173 [emphasis added]). I decline to afford such deference to either the attorney's letter or to Mr. Weinberg's own affidavit. Moreover, it is my personal view that given this defendant's substantial business interests and investments in South Africa and his arrangement whereby the commissions owed him by his South African employer are paid directly to an account in Chicago, there is no doubt whatsoever that the need to preserve the availability of the property outweighed the hardship attendant upon him by virtue of the provisional remedies.

Since I have reached the conclusion that the purported financial disclosure on behalf of Jay E. Weinberg was insufficient to trigger the balancing procedure of CPLR 1312 (3) (b), I vote to affirm the order appealed from in its entirety.

BRACKEN, J. P., and BROWN, J., concur with SPATT, J.; WEINSTEIN, J., concurs in part and dissents in part and votes to affirm the order in a separate opinion.

Ordered that the order is reversed insofar as appealed from by the defendant Jay E. Weinberg, on the law and the facts, without costs or disbursements, and the matter is remitted to the Supreme Court, Kings County, for a hearing on the issue of whether the need to preserve the available property outweighs the hardship to Jay E. Weinberg as set forth in the opinion of Spatt, J. herewith, and pending determination of the application as to Jay E. Weinberg, the temporary restraining order contained in an order to show cause of the Supreme Court, Kings County, dated August 4, 1987, as modified by an order of the same court dated August 7, 1987, is reinstated as to Jay E. Weinberg; and, it is further,

Ordered that the order is affirmed, insofar as appealed from, by the defendants Bed-Stuy Health Care Corporation, Sheldon Weinberg, Roslyn Weinberg, and Presidential Limousine, Inc., without costs or disbursements.