OPINION OF THE COURT
Martin Marcus, J.
In this case, the defendant, formerly an attorney, was charged with four counts of grand larceny in the third degree (Penal Law § 155.35), one count each of grand larceny in the fourth degree (Penal Law § 155.30), petit larceny (Penal Law § 155.25), and scheme to defraud in the first degree (Penal Law § 190.65 [1] [b]), and nine counts of practice of law by disbarred or suspended attorney (Judiciary Law § 486). In essence, the allegations are that the defendant stole money from several clients and another person, both before and after she was suspended from the practice of law. Before any of these charges were brought against the defendant, the Departmental Disciplinary Committee for the First Judicial Department began an investigation into several of these matters, which later became the subject of some of the criminal charges she is now facing.
After complaints were filed against her, and before she was suspended from the practice of law, the defendant testified in a hearing conducted on behalf of the Disciplinary Committee on November 16, 2006, February 21, 2007, March 13, 2008, and November 23, 2009, the first three times without an attorney, and on the final occasion, with one. At the beginning of the first appearance, Roberta Kolar, Esq., an attorney for the Committee, informed the defendant that she was appearing voluntarily, that she was entitled to have counsel with her, and that the proceedings would be adjourned any time she requested counsel. Ms. Kolar also told the defendant that
“[t]his is a civil proceeding and if you should assert your Fifth Amendment privilege we can make an adverse inference. By statute and case law you are required to answer questions even though you might at some point raise an objection to they’re [sic] being entered into evidence should it come to that. But you do have to answer.”
Finally, Ms. Kolar informed her that “this proceeding is *956 confidential pursuant to Section 90.10 of the judiciary law, Title 29.” Ms. Kolar gave the defendant similar admonitions when she testified on March 13, 2008.
On all four occasions that the defendant appeared she answered the questions put to her. On November 16, 2006 and March 13, 2008 — the two occasions in which the defendant was given the admonitions set forth above — she was asked whether money a complainant named Jean John had given to her for the down payment on the purchase of property was still in her escrow account. Both times she testified that the money was still there.
Based on banking records, the People allege that this testimony was false, a fact which the defendant does not now contest. The People assert that in this criminal case, in which the defendant is charged with, inter alia, stealing that money from Ms. John, the falsity of that testimony evidences a consciousness of guilt. Accordingly, they asked permission to offer those portions of the defendant’s hearing testimony at the trial. In a motion in limine, the defendant objected to the admission of the testimony, claiming that the adverse inference that would have been applicable had she asserted her right against self-incrimination rendered her answers compelled within the meaning of the Fifth Amendment. After hearing argument and receiving written submissions from both sides, I held the testimony admissible. This opinion sets forth the reasons for that decision.
The admonitions the defendant received were, without doubt, poorly phrased. As quoted above, she was first told that she had a Fifth Amendment right not to testify, albeit with the possible consequence of the drawing of an adverse inference in the hearing. She was then told that she was “required to answer questions” but that her testimony would be “confidential.” She was not informed that if she answered questions, they might be offered in evidence against her in a subsequent criminal proceeding. Nevertheless, she does not now claim that by being “required to answer questions” she believed she would be compelled to answer them even had she asserted her Fifth Amendment privilege. Nor does she claim that she believed the promise of confidentiality meant her answers could not be offered against her in any subsequent criminal proceedings.
The defendant also does not assert that if she had been specifically informed of the possibility of their use in a subsequent criminal proceeding she would have asserted the privilege. In *957 any case, such a claim would have been unavailing. In United States v Rubinson (543 F2d 951 [2d Cir 1976]), the defendants in a prior civil proceeding asserted the Fifth Amendment privilege as to some questions put to them, but made statements in response to others, and those statements were later offered in evidence against them in a criminal prosecution. The defendants argued that the statements were inadmissible because they would have asserted the privilege in the civil proceeding had they known they would be later prosecuted. The court rejected the claim, reasoning that since they could have invoked the privilege with respect to those questions they did answer, “they [could not] rely upon what information they did disclose to establish prejudice.” (Id. at 961.)
The sole ground upon which the defendant does claim that she was compelled to testify at the disciplinary hearing is the prospect of the adverse inference that could have been drawn against her in that proceeding had she invoked her privilege against self-incrimination. In support of her claim, the defendant cites People v Bass (140 Misc 2d 57 [Sup Ct, Bronx County 1988]). There the court precluded the People from offering against the defendant statements he made to a certified social worker, which the court held were privileged. The defendant does not claim such a privilege applied to her testimony in this case, and none did.
The defendant also relies upon People v Kleiner (170 Misc 2d 850, 852 [Sup Ct, Richmond County 1996]), in which the court held that
“lj]ust as in a criminal case where defendant’s statements at a hearing on a motion to suppress are not admissible if offered by the People in their direct case, likewise defendant’s civil case statements in a pro se lawsuit alleging constitutional violations ought not be introduced against him at a criminal trial on related issues. (See, e.g., Simmons v United States, 390 US 377 [1968].)”
In Simmons (390 US at 394), the Supreme Court held that “when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.” As the Supreme Court and numerous other courts have made clear, however, the Fifth Amendment applies quite differently to testimony given in a civil proceeding, making the analogy drawn in Kleiner inapposite.
*958 In Griffin v California (380 US 609, 614 [1965]), the Supreme Court held, that a person may not suffer any penalty in a criminal case for exercise of her Fifth Amendment right to silence, and that this prohibition is not restricted to fine or imprisonment, but extends to the imposition of any sanction which makes assertion of the Fifth Amendment privilege “costly.” In that case, the penalties in question were comment by the prosecution on the accused’s decision not to testify at his criminal trial, and an instruction by the court that such silence is evidence of guilt — that is, that the jury could draw an adverse inference from the defendant’s failure to testify. In this case, however, that adverse inference would be drawn, not in the criminal case itself, as in Griffin, but in the disciplinary proceeding in which the defendant testified.
In Spevack v Klein (385 US 511 [1967]), an attorney facing disciplinary proceedings in New York was disbarred, as this state’s law then permitted, solely because he refused to honor a subpoena for records and to testify at the judicial inquiry, asserting his Fifth Amendment privilege. Noting that “[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege,” the Court reversed the decision of the Court of Appeals upholding Spevack’s disbarment, finding that a disbarment on that basis violated the Fifth Amendment. (Id. at 516; see also Garrity v New Jersey, 385 US 493 [1967] [statements made by police officers under investigation by state attorney general’s office could not be used against them in criminal proceeding because the officers were told that if they did not answer them without grant of immunity they were subject to removal from office].) As the New York Court of Appeals has explained, in Spevack the Supreme Court viewed “[t]he threat of disbarment for the mere exercise of the privilege ... as an unconstitutional compulsion to waive the privilege without a coextensive protection against the ultimate use of those statements in a criminal proceeding.” (Matter of Anonymous Attorneys, 41 NY2d 506, 511 [1977].) Thus, it is clear that when suspension or disbarment can flow automatically from exercise of an attorney’s Fifth Amendment right, the attorney can be compelled to testify only “[w]hen assurance is made that the statements cannot be used in a related criminal action.” (Id.)
As the People correctly observe, however, the assertion of the right against self-incrimination in an attorney’s disciplinary *959 proceeding in New York is no longer by itself sufficient to justify the attorney’s suspension or disbarment. Instead, it may result only in the drawing of an adverse inference, which may be considered along with other evidence of misconduct in determining whether to suspend or disbar the attorney. Moreover, such action may be taken only “in conjunction with other misconduct which, together, form[ ] a basis for ‘uncontested evidence of professional misconduct.’ ” (Matter of Kapchan, 86 AD3d 110, 112 [1st Dept 2011].) In other words, “merely invoking one’s Fifth Amendment right against self-incrimination should not serve as a separate ground for an interim suspension.” (Id,.; see also Matter of Harris, 97 AD3d 96 [1st Dept 2012]; People v Smith, 29 AD3d 1035, 1037 [3d Dept 2006]; Matter of Muraskin, 286 AD2d 186 [1st Dept 2001].)
In Baxter v Palmigiano (425 US 308 [1976]), which arose from a Rhode Island prison disciplinary proceeding, the Court faced the question whether an adverse inference could be drawn from the prisoner’s silence in that proceeding. The Court distinguished its decision in Griffin, noting that the inference was to be drawn in the disciplinary hearing and not in a criminal case. Moreover, it noted that in Rhode Island, “an inmate’s silence in and of itself [was] insufficient to support an adverse decision by the Disciplinary Board,” which “must be based on substantial evidence manifested in the record of the disciplinary proceeding.” (Id. at 317 [internal quotation marks and citation omitted].) On this basis, the Court distinguished those of its prior decisions in which “refusal to submit to interrogation and to waive the Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State.” (Id. at 318.) Thus, the Court concluded, drawing an adverse inference from the prisoner’s silence did not offend the Fifth Amendment. The Court observed that “[h]ad the State desired [the prisoner’s] testimony over his Fifth Amendment objection,” it could have compelled it by “extending] whatever use immunity is required by the Federal Constitution.” (Id.) The Court did not, however, explicitly state whether, had the prisoner answered questions without asserting his Fifth Amendment right and without such a grant of immunity, those answers could have been used against him in a criminal proceeding.
Analysis of that issue begins with United States v Kordel (397 US 1 [1970]), an earlier decision in which the Court held the answers to interrogatories submitted to a corporation and given *960 by the defendant, one of its vice-presidents, could be used against him in a subsequent criminal prosecution. Had no one answered the interrogatories on behalf of the corporation, the government could have seized certain products it manufactured. Nonetheless, the Court reasoned that because the defendant could have invoked his Fifth Amendment privilege against compulsory self-incrimination rather than answer the interrogatories, he was not compelled to give testimony against himself even if “the information [the defendant] supplied the Government in his answers to the interrogatories, if not necessary to the proof of the Government’s case in the criminal prosecution, ... at least provided evidence or leads useful to the Government.” (Id. at 6.)
Numerous federal courts have relied on Baxter and Kordel in concluding that, even when the civil matter is one brought by the government, “[a] defendant has no absolute right not to be forced to choose between testifying in [that] civil matter and asserting his Fifth Amendment privilege.” (Keating v Office of Thrift Supervision, 45 F3d 322, 326 [9th Cir 1995] [rejecting Fifth Amendment challenge to administrative law judge’s decision banning defendant from federally insured banking industry and directing him to pay restitution].) In Hoover v Knight (678 F2d 578 [5th Cir 1982]), the Fifth Circuit held that the failure to postpone an administrative hearing resulting in a police officer’s termination while criminal charges were pending against the officer did not violate the Constitution. Similarly, in De Vita v Sills (422 F2d 1172, 1178 [3d Cir 1970]), the Third Circuit upheld the denial of a request to enjoin an inquiry into the possible disbarment of the plaintiff, both a judge and an attorney, against whom an indictment was also pending, noting that Kordel rejected “the contention that an actual or potential defendant in a criminal case should not even be put to the difficult choice of having to assert the privilege in a related civil case.”
The Second Department reached a similar conclusion in Kuriansky v Bed-Stuy Health Care Corp. (135 AD2d 160 [2d Dept 1988]). There, in determining whether to freeze assets of the defendant that were sought in a civil forfeiture proceeding, the trial court directed the defendants, against whom criminal charges were also pending, to disclose certain financial information. The Second Department upheld the order, noting that the defendants could assert their privilege against self-incrimination, and that while such an assertion could be *961 considered in the civil proceeding, it would not result in an automatic forfeiture of their property. Citing Baxter, the Court held that the order did “not subject the defendants to the ‘potent sanctions’ held [in other cases] to violate the privilege against self-incrimination.” (Id. at 180.)
The unstated implication in all of these cases is that if a person forgoes her Fifth Amendment privilege in a civil matter and makes statements, even in a disciplinary hearing like this one, in which an adverse inference may be drawn from the assertion of the privilege against self-incrimination, a prosecutor can offer those statements in evidence against her in a subsequent criminal case. Other courts have explicitly said so. In Arthurs v Stern (560 F2d 477 [1st Cir 1977]), for example, a physician accused of writing illegal prescriptions sought to suspend disciplinary proceedings against him until pending criminal charges were resolved. Relying on Baxter, the First Circuit held that the Fifth Amendment did not prohibit the board conducting the proceedings from drawing an adverse inference should the physician refuse to testify. Relying on Kordel, the court concluded that there was nothing “inherently repugnant to due process in requiring the doctor to choose between giving testimony at the disciplinary hearing, a course that may help the criminal prosecutors, and keeping silent, a course that may lead to the loss of his license.” (Id. at 478-479 [emphasis added].) Similarly, in Brock v Tolkow (109 FRD 116, 119 [ED NY 1985]), the court noted that cases subsequent to Kordel, including Baxter, Arthurs and Rubinson, “have made even clearer that it is not unconstitutional to force a litigant to choose between invoking the fifth amendment in a civil case, thus risking a loss there, or answering the questions in the civil context, thus risking subsequent criminal prosecution.”
State v Horton (561 A2d 488 [Me 1989]) is a case on all fours with this one. There, the defendant, an attorney, made statements in an inquiry conducted by the Grievance Commission of the Board of Overseers of the Bar concerning an alleged misappropriation of money left with him by a client, never raising his Fifth Amendment privilege not to testify. After he was indicted on charges based upon the same alleged misappropriation, the trial court suppressed the statements, finding that they were obtained involuntarily. The Supreme Judicial Court of Maine reversed and held the statements admissible, citing Baxter for the proposition that “[disciplinary proceedings are civil in nature, and a lawyer has no constitutional right to prevent the *962 factfinder in that proceeding from considering the implication of his silence, along with other evidence against him, in making a determination.” (Id. at 491.) Citing Arthurs, the court concluded that “[i]f he chooses to invoke his Fifth Amendment privilege and remain silent, a lawyer might be disciplined for the underlying misconduct charged by the Board, but that does not mean he is compelled to speak rather than assert his privilege.” (Id.)
Similarly, in United States v McKinney (695 F Supp 2d 182 [ED Pa 2010]), the court held that a doctor’s statements at a DEA hearing concerning the possible suspension of his license to prescribe drugs were admissible against him in a criminal prosecution for distribution of a controlled substance, even though the agency could draw an adverse inference against him in the hearing if he chose not to testify. Relying on Arthurs and Keating, the court concluded that the doctor “was able to choose whether or not he wanted to testify” at the DEA hearing, and “his Fifth Amendment rights were not violated when he chose to testify . . . .” (Id. at 196; see also People v Reed, 247 AD2d 900, 900 [4th Dept 1998] [statements made by Erie County caseworker during investigatory interview concerning alleged misappropriation of client funds admissible against her in criminal trial since, “(a)lthough defendant was told that, if she was not willing to cooperate, it ‘would shed a certain kind of light on her in terms of what her role in this whole thing was’, that is not the type of explicit or implicit threat that serves to immunize defendant’s subsequent responses to questioning”].)
Similarly, in this case, had the defendant exercised her right to silence in the disciplinary proceeding, her silence could have been considered, along with other evidence, in determining whether she should be suspended from the practice of law. Had she done so, her assertion of that right could not, of course, have been offered in evidence against her in this trial. However, she chose instead to testify, and because that choice was voluntary and not compelled within the meaning of the Fifth Amendment, her testimony is admissible against her in this criminal case.
Finally, the defendant asserts that the hearing testimony should not be admitted because its probative value is outweighed by the prejudice it would cause her, in particular because her motivation in testifying falsely at the hearing was her fear of suspension and disbarment, which could be based solely on the violation of the disciplinary rules committed by her removal of *963 the funds from the escrow account, regardless of whether she stole those funds. This argument is also without merit. First, evidence that the money was removed from the account is admissible to establish that she stole it, regardless of whether her hearing testimony to the contrary is admitted at trial. Second, while defense counsel may argue to the jury that her motive in giving the false testimony was solely to prevent her suspension (and, of course, the defendant, if she wishes, may so testify), the jury is entitled to consider that her false testimony was evidence of her consciousness of guilt of the alleged theft.
In the seminal case of People v Yazum (13 NY2d 302, 304 [1963]), the defendant, who was wanted in Ohio for a parole violation, argued that it was error to admit at his criminal trial in New York evidence of his attempted escape from custody as consciousness of guilt of the crime. The Court of Appeals rejected the argument, noting that
“[i]t is quite true that the attempted escape might have been motivated by a consciousness of guilt of the Ohio parole violation as well as by guilt feelings over the crime involved here. Indeed, the defendant may have fled because of guilt of both, or for some other innocent reason. This spectrum of possibilities, however, does not differ materially from that present in any case in which a defendant’s flight is introduced in evidence” (id.).
Observing that “[t]his court has always recognized the ambiguity of evidence of flight and insisted that the jury be closely instructed as to its weakness as an indication of guilt of the crime charged” (id.), and noting that such a charge had been given, the Court upheld the defendant’s conviction. (See also People v Flores, 14 AD3d 351, 351 [1st Dept 2005] [citing Yazum in holding that it was proper for trial court to give consciousness of guilt charge, and noting that “(a)ny ambiguity in defendant’s conduct was for the jury to consider”].) Here, too, although the defendant may have had another motive for testifying falsely, it is nonetheless relevant as evidence of consciousness of guilt, and the jury will receive the appropriate instruction concerning the weakness of such evidence.
For these reasons, the People’s application to permit admission of the relevant portions of that testimony was granted and the defendant’s in limine motion to preclude their admission was denied.