OPINION OF THE COURT
Stephen G. Crane, J.
In this forfeiture action under CPLR article 13-A, the plaintiff claiming authority (CPLR 1310 [11]) moves by order to show cause dated July 27, 1992 (Bradley, J.) for an order of attachment, to the extent of $40,420,080, of any property in which defendants have an interest. (CPLR 1312.) Pending determination of the motion, Justice Bradley imposed a temporary restraining order (TRO). (CPLR 1316.) This not only restrained the transfer or disposition of the assets of both defendants in this jurisdiction but also restrained the defendants personally with respect to their assets wherever located.[1] (CPLR 1333.) As a consequence of the TRO, accounts of defendant Clifford located in New York worth over $18,000,000 were frozen. No New York assets of defendant Altman were located.
The defendants, by separate order to show cause, moved to vacate the TRO. (CPLR 1336.) Later, they also moved to modify the TRO to permit release of funds to pay defendant Clifford’s reasonable living expenses, family support, law firm *334 expenses and reasonable and bona fide attorneys’ fees and expenses in this action and the related criminal matters. Mr. Clifford has $1,926 million in unrestrained securities in Washington. These securities, however, have a very low tax basis, and it would be tax suicide for Mr. Clifford to liquidate them. Therefore, on oral argument the court suggested and the claiming authority consented to a swap of these securities for an equivalent amount in value of securities or cash in New York that are subject to the TRO. The parties also agreed to treat this motion (to modify the TRO) as one under CPLR 1311 (4) as well, i.e., to dismiss or limit the forfeiture action in the interest of justice.
This court held the last motion in abeyance pending the exchange of the $1.926 million in securities, the receipt of further affidavits on the interest of justice application and the filing, ex parte and under seal, of a copy of Mr. Clifford’s 1991 Federal income tax return and his most recent certified statement of net worth filed with a lending institution or regulatory authority.[2] Mr. Clifford supplied a copy of his 1991 tax return and represented that he had no such certified statement of net worth. Relative to the interest of justice issues, the parties submitted the papers in support of and in opposition to the motion then pending before Justice Bradley to dismiss the indictment against Mr. Clifford in furtherance of justice. (CPL 210.40.)
The court later learned that the exchange of the $1.926 million of securities would not occur because Mr. Clifford is emotionally attached to these long held securities. The court also learned that the bills for services by Davis Polk & Wardwell (Davis Polk) and by Skadden, Arps, Slate, Meagher & Flom (Skadden Arps) are rendered jointly to or on account of Mr. Clifford and Mr. Altman. The court held a further hearing ex parte and under seal, though transcribed, and asked for the itemized bills of these firms and of Stillman, Friedman & Shaw, P. C. (Stillman), Mr. Clifford’s counsel in the New York criminal prosecution. These were filed ex parte and under seal. The court also requested explanations for certain items revealed by the 1991 income tax return that had previously been filed, but responses were not timely received.
*335 THE FACTS ACCORDING TO PLAINTIFF
As a result of an investigation, led by Assistant District Attorney John Moscow (Moscow), into the Bank of Credit and Commerce International (BCCI) and its relationship with American banks, the plaintiff concluded that defendants, Clifford and Altman, had helped defraud bank regulators regarding the influence of BCCI over First American Bankshares, Inc. (FAB) and its affiliates, including First American Bank of New York (FABNY). For over a decade, BCCI through Agha Abedi (Abedi) and others insinuated itself into American banking. In accomplishing this they retained Clifford, Altman and their law firm. BCCI gained control of Financial General Bankshares (FGB), through the efforts of Clifford and Altman and their representations, including Clifford’s statements to the Federal Reserve Board, that BCCI had no function in this ownership. FGB was renamed FAB, and it acquired a New York presence as FABNY. The defendants became directors and officers of FAB and related entities.
BCCI had gained its control of these corporations through nominees (BCC Group) who had side agreements with BCCI by which the voting shares of the nominees were controlled. BCCI had extended nonrecourse loans to these individuals to acquire their shares. In July 1986 Clifford obtained a $9.9 million and Altman a $4.9 million nonrecourse loan to purchase shares. Another nonrecourse loan in August 1987 of $2.3 million to Clifford and $1.1 million to Altman was made by the same lenders. The result was that the defendants acquired shares which were pledged as the only security for these loans. At the time defendants acquired these shares, an arrangement was made for resale subject to BCCI consultation whenever defendants would desire.
Then the defendants arranged to sell most of their shares for $32.6 million, a greatly inflated price that the BCC Group implemented. The price per share was arranged to net Altman and Clifford a profit, after capital gains taxes, of $1.5 million and $3 million respectively. These shares were sold for $32,640,000 with 2,246 shares remaining that the BCC Group agreed to buy on the deaths of Altman and Clifford at $2,310 per share.
THE INDICTMENT
Clifford and Altman, along with other BCC Group members, were accused of various crimes in the County of New York *336 and elsewhere. Clifford and Altman were included in a charge of scheme to defraud in the first degree, Penal Law § 190.65 (1) (b), a class E felony (count 1), the alleged victims being Federal and State bank regulators and persons doing business with banks. The second count charges a conspiracy against all defendants, Penal Law § 105.05 (1), to commit the felonies of commercial bribery and commercial bribe receiving in the first degree. The object of the conspiracy was to secure BCC Group control over FAB, FABNY and related entities and to reward Clifford and Altman. Among the overt acts alleged by the Grand Jury were the loans and purchase of shares for Clifford and Altman and their resale at a predetermined pretax profit.
Count 5 accuses Clifford and Altman of commercial bribe receiving, first degree, Penal Law § 180.08, a class E felony. The Grand Jury alleges they, as employees and fiduciaries, agreed to accept from the BCC Group a benefit exceeding $1,000 in value, "to wit, the opportunity to purchase * * * stock at book value, certain non recourse loans and the right to sell [this bank] stock.” This agreement included an understanding that the benefit would influence the conduct of these defendants in relation to the affairs of their employers. This caused economic harm of over $250.
The indictment charges various other crimes not particularly important to the issues presented on the three motions now under consideration.
PROCEDURAL BACKDROP OF THESE MOTIONS
Clifford and Altman are sued here as "criminal defendants” in a "post-conviction forfeiture crime.” (CPLR 1310 [9], [5].) As such, the claiming authority is entitled to seek forfeiture of "the proceeds of a crime, the substituted proceeds of a crime * * * or to recover a money judgment in an amount equivalent in value [thereto]” (CPLR 1311 [1]). Such an action will be stayed during the pendency of "a criminal action which is related to it,” but the claiming authority may pursue any provisional remedy available. (CPLR 1311 [1] [a].)[3]
*337 Provisional remedies in forfeiture actions are authorized by CPLR 1312. These include attachment and injunction, even though this is an action for a money judgment. The claiming authority must demonstrate that "(a) there is a substantial probability that [it] will prevail on the issue of forfeiture and that failure to enter the order may result in the property being destroyed, removed from the jurisdiction of the court, or otherwise be unavailable for forfeiture; [and] (b) the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order may operate.” (CPLR 1312 [3].) On a motion for an attachment the court is authorized to grant, ex parte, a TRO prohibiting transfer of assets (CPLR 1316).[4]
In keeping with its concern for the hardship that a provisional remedy might impose, the Legislature in Laws of 1990 (ch 655) amended article 13-A in a respect pertinent to the issues at hand. It added subdivision (4) to CPLR 1312: "Upon motion of any party against whom a provisional remedy granted pursuant to this article is in effect, the court may issue an order modifying or vacating such provisional remedy if necessary to permit the moving party to obtain funds for the payment of reasonable living expenses, other costs or expenses related to the maintenance, operation, or preservation of property which is the subject of any such provisional remedy or reasonable and bona fide attorneys’ fees and expenses for the representation of the defendant in the forfeiture proceeding or in a related criminal matter relating thereto, payment for which is not otherwise available from assets of the defendant which are not subject to such provisional remedy. Any such motion shall be supported by an affidavit establishing the unavailability of other assets of the moving party which are not the subject of such provisional remedy for payment of such expenses or fees.”[5]
Also pertinent is CPLR 1311 (4) (a) (ii) authorizing the court *338 to dismiss this action in the interests of justice or to limit "the forfeiture to an amount equivalent in value to the value of property constituting the proceeds or substituted proceeds of a crime.” Compare CPL 210.40 where the court, applying factors similar to but more extensive than those in CPLR 1311 (4), may dismiss an indictment or any count thereof in furtherance of justice.
THE ISSUES
The defendants claim that virtually all their assets were frozen by the TRO and that this is punitive. By contrast, they stress repeatedly the civil, remedial nature of article 13-A.[6] They also argue that the plaintiff has failed to demonstrate that the property will be removed from New York. Defendants oppose an attachment on the ground that plaintiff has not demonstrated a substantial probability that it will prevail. They criticize the nature of plaintiff’s showing — an affirmation of Moscow without affidavits of potential witnesses.
Defendant Clifford asks for the release of $120,000 to meet a shortfall of income from other sources to pay for his $180,000 annual living expenses, almost $325,000 for annual gifts to help his offspring, another $25,000 for medical expenses exceeding insurance coverage and $420,000 to meet his monthly contributions to keep solvent the Law Offices of Robert A. Altman. In addition, he seeks release of $200,000 to pay back a loan borrowed for past living expenses since the freeze (secured by his securities in Washington, D.C.) and funds for attorneys’ fees: $1,408,975 to Davis Polk; $2,350,613 to Skad *339 den Arps; and $100,000 to Stillman. Finally, he forecasts a future need for funding to pay taxes. Clifford also urges the court to dismiss this action for the reasons he asked Justice Bradley to dismiss the indictment.
In all three motions, Mr. Clifford has argued vigorously that the forfeiture law was designed to take the profit out of crime. He strenuously and repeatedly urges the court to reduce the TRO and any attachment that may be granted to the amount of the profit. This, he claims, amounts to a net, after taxes, of $2.7 million for him and $1.3 million for Altman or a profit before taxes for Clifford of no more than $6.5 million.
The plaintiff, on the other hand, contends that the measure of the funds to be attached is determined by CPLR 1311 (1) authorizing a claiming authority to recover, inter alla, a money judgment equivalent to the proceeds of a crime or the substituted proceeds of a crime. As these terms are defined in CPLR 1310 (2) and (3), the plaintiff lays claim to the full amount realized by both defendants on their resale of the stock plus the value of the remaining shares that they still hold. Plaintiff further contends that his papers satisfy the demonstration required by CPLR 1312 (3) and that an evidentiary hearing is unnecessary. Lastly, plaintiff urges the court to limit any release of funds from the TRO to reasonable living expenses and bona fide and reasonable attorneys’ fees and expenses. Plaintiff urges the court to deny dismissal of the action for the same reasons he opposes the dismissal of the indictment against Clifford.
CONCLUSIONS OF LAW
1. The Requirements of CPLR 1312 (3)
(a) Substantial probability of prevailing
Plaintiff’s papers, particularly the Moscow affirmation, established a substantial probability that he will prevail on the issue of forfeiture. The hearsay nature of Moscow’s proof is no obstacle to this conclusion. (Kuriansky v Bed-Stuy Health Care Corp., 135 AD2d 160, 169-170, affd 73 NY2d 875.) As in Bed-Stuy (at 170), the Moscow affirmation was replete with detailed, factual information to the point of excessiveness. The sources of Moscow’s information are scrupulously revealed. Defendants’ protestations of innocence and interpretation of the Moscow evidence favorable to them do not destroy the strong contrary inferences that this evidence supports. No *340 hearing is necessary or warranted. (CPLR 1318 [1]; cf., CPLR 1334.)
In any event, the crime on the basis of which this forfeiture action rests and on which plaintiff founds its calculation, commercial bribe receiving in the first degree, is supported by the nonrecourse nature of the loans, the BCCI source of these loans and the congruence of the structure of their stock acquisition with that of the many other fronts and nominees for BCCI and the BCC Group. Clifford’s explanation that his lawyers at Wachtel, Lipton, Rosen & Katz suggested a nonrecourse loan in view of his advanced age is not persuasive, particularly because such advice in no way explains why his younger protégé, Mr. Altman, also secured nonrecourse borrowing.
Neither is it fatal to this application that no witness can directly establish the bribe. As is usual in such cases, the briber is exposed to criminal liability. Indeed, Abedi and Swaleh Naqvi, the alleged bribers, are joined as defendants in the indictment with Clifford and Altman. It would be ludicrous to reject Moscow’s proof because he had no affidavit from Abedi or Naqvi. Finally, the illicit purpose of the bribe is established by the "proof of the pudding” test when Clifford and Altman thereafter caused the purchase at an inflated price of the National Bank of Georgia thereby bailing out Gaith Pharaon, a major BCCI shareholder.
(b) Failure to attach may result in the property being removed from New York or rendered unavailable
Plaintiff relies on the deception underlying defendants’ actions in concealing from bank regulatory authorities the involvement of BCCI as well as defendants’ out-of-State residences to establish that asset dissipation "may result” in the absence of attachment. The plaintiff’s burden is more modest than would be the case if the statute, CPLR 1312 (3) (a), required him to prove that dissipation "will” result if attachment is withheld. The burden is less than imposed on a claiming authority to secure the preliminary injunction which plaintiff has abandoned. (See, n 4, supra; CPLR 1333; see also, CPLR 6301; cf., CPLR 6201.) The alien status of the defendant and the liquidity and easy transferability of the attached assets in Holtzman v Samuel (130 Misc 2d 976, 983) satisfied the "may result” burden. (See also, Dillon v Secular, 132 Misc 2d 279.) Clifford lists all his New York assets as liquid in his ex parte sealed financial disclosure.
*341 (c) Balancing hardship
The final hurdle for the plaintiff requires him to show that “the need to preserve the availability of the property * * * outweighs the hardship on any party.” (CPLR 1312 [3] [b].) In analyzing this balance, the court has considered the financial data submitted in connection with Clifford’s motion to release funds for living expenses and attorneys’ fees. The court has examined Mr. Clifford’s 1991 Federal income tax return. (See, Kuriansky v Bed-Stuy Health Care Corp., supra, 135 AD2d, at 176.) Upon these data, and mindful of the mitigation available through CPLR 1312 (4), the court is satisfied that the hardship to Mr. Clifford is outweighed by the need to preserve in New York his attached property to deter criminal conduct, strip an alleged criminal of ill-gotten gains and preserve assets to compensate victims. (CPLR 1349; Morgenthau v Citisource, Inc., 68 NY2d 211, 221; Dillon v Bialostok, 136 Misc 2d 695, 697; Holtzman v Samuel, 130 Misc 2d 976, 984, supra.)
2. "Profits”
In his efforts to limit the scope of the attachment to $4 million, Mr. Clifford argues that the result is Draconian if the nonrecourse loan, interest and commission, and his capital gains taxes are not recognized. To evaluate this position, it is necessary to focus on just what the statute allows and analyze how the facts of this case fit within these provisions of the law.
We have seen that forfeiture is authorized for crime proceeds or substituted proceeds. (CPLR 1311 [1].) These are defined terms.[7] The crime of commercial bribe receiving in the first degree is a felony "defined in the penal law” (CPLR 1310 [5]) and qualifies as a predicate for forfeiture under the definition of “proceeds.” Included in the corpus of the bribe was the nonrecourse loan. It was through the use of that loan that Clifford acquired his shares. These shares became the substituted proceeds of this crime. The resale of most of these shares, by prearrangement with Abedi and the BCC Group at an inflated price, represents a gain or appreciation in value. This gain is not strictly realized by the sale or exchange of the loan for the stock nor an appreciation in the value of the *342 stock. Therefore, in order to capture the full sale proceeds, including the nonrecourse loan amount, the prearrangement for resale at whatever price Clifford wanted must be considered as part of the bribe. The indictment certainly embraces both features of the bribe. It alleges that the benefit defendants agreed to accept was "the opportunity to purchase [the bank] stock at book value, certain non-recourse loans and the right to sell [this] stock.”
Since the defendants have not parsed the alleged bribe in an attempt to eliminate as "proceeds” one or more of these alleged features of the "benefit,” the entire package must be construed as the "proceeds of a crime.” Manifestly, this package includes the nonrecourse loans themselves, the stock and the appreciation in value of this stock realized on its resale.
Next in consideration of the quantum of assets attached is the nature of Mr. Clifford’s liability for Mr. Altman’s proceeds. Here, again, defendants have made no effort to divide the two. Since an indictment need not allege an acting in concert theory in order for a prosecution to proceed on that theory (People v Valerio, 64 AD2d 516), it can be argued that the defendants in this forfeiture action are jointly and severally liable for the proceeds obtained by both. (Kuriansky v Natural Mold Shoe Corp., 133 Misc 2d 489, 497, mod on rearg 136 Misc 2d 684.)
Defendants rely heavily on a group of cases decided under Federal RICO (Racketeer Influenced and Corrupt Organizations Act) legislation. (18 USC § 1961 et seq.)[8] What makes *343 these RICO cases compelling is the punitive nature of RICO forfeiture in contrast to the civil, remedial character of CPLR article 13-A. (Morgenthau v Citisource, Inc., supra, at 217.) On the other hand, one noted authority on New York’s forfeiture law, Steven Kessler, in Quo Vadis? Assessing New York’s Civil Forfeiture Law (4 Touro L Rev 253), while recognizing its avoidance of any "sweeping punitive provision authorizing penalties financially disproportionate to the profits secured as a result of the underlying crimes” (id., at 255, n 6), states that there is no requirement that the defendant "actually receive the proceeds or receive the benefit of those proceeds.” (Id., at 277; see also, Kuriansky v Natural Mold Shoe Corp., supra, at 497; 2A Weinstein-Korn-Miller, NY Civ Prac If 1310.02.)
As persuasive a case for fairness that could be made out for deducting the direct costs of buying the shares, as in United States v Elliott (supra), the case at bar is not a RICO forfeiture case, and most conclusively, the direct costs themselves (the nonrecourse loans) represent part of the proceeds of the bribe. Perhaps, if the stock had been acquired with their own, untainted funds, the defendants would merit a different result. Indeed, the point can be driven home that no deduction for the loans is appropriate at bar by observing that if defendants still held all the shares, their entire value, without diminution for the loans, would be forfeitable. (See, 2A Weinstein-KornMiller, op. cit, |f 1310.02, at 13-A-10, 13-A-16.)
3. The Living Expenses and Attorneys’ Fees
Plaintiff appropriately objects to Mr. Clifford’s efforts to fund family gifts and to continue monthly contributions to the Law Offices of Robert A. Altman. Plaintiff argues that release of funds for lawyers’ fees should be at County Law article 18-B rates (County Law § 722-b), and that legal fees for representing defendant Clifford in the Washington, D.C. Federal prosecution are unrelated to this forfeiture action and should be denied. Plaintiff further contends that the restrained New York assets should not be available to pay past due legal bills, and that since the bills cover representation of both defendants, Clifford’s assets should not be used to pay for Altman’s legal fees.
The Governor’s Bill Jacket for Laws of 1990 (ch 655), adding CPLR 1312 (4), contains precious little concerning this provi *344 sion in contrast to many other aspects of chapter 655 — most notably, real property forfeitures. A major purpose of subdivision (4) seems to have been to free funds from restraint to hire an attorney or post bail.
(a) Legal fees
Whatever applicability subdivision (4) may have to attorneys’ fees for services in the Federal prosecution need not be resolved.[9] The reason for this is that payment of the fees must be otherwise unavailable from nonfrozen assets. Indeed, CPLR 1312 (4) requires defendant to submit an affidavit establishing the unavailability of other assets. Defendant has over $1.9 million outside New York. His reluctance to commit tax suicide is understandable. This is why the court authorized an exchange of these securities for an equivalent amount in value that have been restrained in New York. Clifford’s sentimental attachment to these securities is insufficient to render them unavailable to pay attorneys’ fees. Placing these assets under restraint is not equivalent to sale or loss. This would happen only if he is convicted in New York, a result he is confident he will avoid.
Defendant might argue that the $1.9 million is insufficient to pay his attorneys’ fees. This possibility merits examination. His unpaid legal bills aggregate nearly $4 million. The bills of Skadden Arps and Davis Polk run to both Clifford and Altman and are not separated for services to one or the other. The bills of both firms cover periods antedating the indictment in New York. At least, the bills are susceptible of breakdown according to the dates incurred. The Stillman firm represents only Clifford and its fees relate solely to the New York cases. Thus, if no other assets were available, there would be no problem paying its bill or requested retainer. But, all of the *345 bills for New York related work after the indictment was handed down aggregate $594,225.17. This is exceeded by the assets in Washington owned by Mr. Clifford.
Is the court justified in restricting payment to the postindictment period? It appears, again in accord with the discernible legislative intent to preserve assets for forfeiture (see, n 9, supra), that bills for legal services and expenses predating the existence of the forfeiture proceeding and its related criminal matter are not within the contemplation of CPLR 1312 (4). This may be a cramped interpretation of the phrase "criminal matter”, but it accords with the purpose of inserting subdivision (4) — to permit a defendant to use his otherwise frozen assets to hire an attorney. There is no support for the contrary reading that a criminal defendant could use this escape valve to pay all past due legal bills, whether or not for services that predated the indictment but may have been devoted to avoiding one. Such a use of seized assets would thwart the governmental interest in stripping a defendant of ill-gotten gains and preserving assets to compensate victims. (Morgenthau v Citisource, Inc., supra.)
Furthermore, the Skadden Arps and Davis Polk bills, even for the postindictment, New York related services, are rendered to both Altman and Clifford. While they may both be prosecuted as accessories to each other and be found jointly and severally liable for the proceeds each obtained from his crimes (see, Kuriansky v Natural Mold Shoe Corp., supra, at 497; United States v Masters, supra, at 1369, and cases there cited), this does not signal a loophole in section 1312 (4) through which all of the restrained assets of one defendant can be vacuumed up to pay the legal expenses of both. The same governmental interest would be thwarted as in the use of these funds to pay prior legal bills. (Morgenthau v Citisource, Inc., supra.)
One final point needs to be covered. The court resoundingly rejects plaintiff’s argument that compensation in any event should be capped at the rate for attorneys appointed for indigent defendants under County Law article 18-B. There is no indication the Legislature attempted to restrict the right of a defendant freely to choose his attorney by any such ceiling. This would make a mockery of a defendant’s choice because what private attorney in his right mind would accept such compensation. The rates paid to 18-B attorneys are woefully inadequate and bear no resemblance to the requirements of attorneys in private practice. If the Legislature wanted to *346 impose such a restriction, it hardly needed section 1312 (4). It could have left a defendant, whose assets had been seized, the avenue taken by other indigent accused persons.
(b) Living expenses
The defendant claims he needs $180,000 per annum ($15,000 monthly) for his daily living expenses. Of this he says he needs $120,000 because he earns $60,000 from the securities not subject to restraint — $1,926,000. The court examined his 1991 return and found income, unrelated to the restrained assets, amounting to some $407,856. Consequently, in view of the income defendant enjoys from nonfrozen sources and the availability of over $1.9 million of nonrestrained assets (albeit subject to a $200,000 broker’s loan), the application to modify the TRO for living expenses should also be denied.
(c) Family gifts and law firm contributions
The court agrees with plaintiff that the vast sums Mr. Clifford gives to his family members and contributes to Mr. Altman’s law firm are not contemplated by CPLR 1312 (4). Indeed, if they were to be recognized, a sluice, not a loophole, would be opened and the TRO and prospective attachment would be empty remedies.
4. Interests of Justice
The parties believe their showings to Justice Bradley under CPL 210.40 are pertinent to Mr. Clifford’s motion under CPLR 1311 (4). The problem with this treatment of the motion, however, is that in the circumstances of this case the court can only dismiss but cannot reduce the scope of the TRO, attachment or potential forfeiture judgment. This is so because subdivision (4) (a) permits the court to carve out and exclude from forfeiture the instrumentality of a crime or the real property instrumentality of a crime as defined in CPLR 1310 (4) and (4-a). In the case at bar, neither of these is claimed. Thus, for Mr. Clifford this motion under CPLR 1311 (4) is an all or nothing proposition.
The statute invokes certain standards for application of an interest of justice dismissal. The court must consider any compelling factor[10] demonstrating that forfeiture would not serve justice. The defendant, before Justice Bradley, made his major point for dismissal turn on his health. Indeed, Justice Bradley held a hearing to probe that issue. Defendant claimed that a trial would surely kill him, but also that the ongoing *347 stress of the pendency of the New York prosecution was severely detrimental to his cardiac status and itself was life threatening. The prosecutor observed the absence of a similar motion in the Federal case and urged Justice Bradley simply to sever Mr. Clifford’s case and stay his trial pending recovery of his health.
While CPLR 1311 (4) is said to have borrowed from People v Clayton (41 AD2d 204), after which CPL 170.40 and 210.40 were fashioned (Legis Mem of NY Civil Liberties Union, Bill Jacket, L 1990, ch 655, at 4), it is yet to be seen whether relief will be routinely denied except in the most compelling circumstances as in criminal cases. (Id., at 5; People v Garcia, 126 Misc 2d 579, 581; People v Stern, 83 Misc 2d 935, 940.) But in the case at bar, it seems inappropriate for this court, on the very papers submitted to Justice Bradley, without the hearing he deemed necessary to decide the application, to make an interest of justice determination. This is the "tail wagging the dog.” Indeed, this court is confident that the parties would bring to the attention of Justice Bradley whatever ruling would have been made on the merits in this proceeding and that one side would argue that the adversary is bound by it for purposes of the criminal case. This would not be a just resolution of issues before Justice Bradley. This court, therefore, declines at this juncture to rule on the application. After Justice Bradley makes a determination, defendant, if so advised, may renew his motion under CPLR 1311 (4) if this action is not rendered largely academic by Justice Bradley’s resolution. The parties will then be free to argue whether or not his determination is binding in this action.
SUMMARY
The motion for an attachment is granted. Defendants’ motion to vacate the TRO is denied. Clifford’s motion to modify the TRO to release funds for reasonable living expenses and bona fide attorneys’ fees and expenses is denied without prejudice to any future application should other assets or sources of income no longer be available. The added application at oral argument to treat the motion to modify the TRO *348 as an application to dismiss in furtherance of justice is denied without prejudice to renewal after Justice Bradley decides his motion under CPL 210.40. All material that has been sealed shall remain under seal.
[Portions of opinion omitted for purposes of publication.]

. On the argument of this motion, plaintiff abandoned its request for a preliminary injunction which effectively released the assets of the defendants outside of New York. The assets in New York subject to the application for attachment belong exclusively to defendant Clark Clifford, and Robert Altman has no legal title to any of these.

. Mr. Clifford had already filed, ex parte and under seal, an affidavit and memorandum detailing his liquid and nonliquid assets and setting forth his liabilities including counsel fees.

. Special note must be made of the above-quoted phrase "a criminal action which is related to it” because the parties are at issue over whether attorneys’ fees for defending Clifford in the related prosecution in Federal District Court in Washington, D.C. are cognizable under CPLR 1312 (4). In this regard, section 1311 (1) (a) refers back to and is limited by the label "post-conviction forfeiture crimes.” These are defined in CPLR 1310 (5) as "any felony defined in the penal law or any other chapter of the consolidated laws of the state.” Manifestly, this does not embrace Federal crimes.

. In addition to the general standards the claiming authority must meet for any provisional remedy under CPLR 1312 (3), to secure a preliminary injunction it must also demonstrate "that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of the claiming authority’s rights respecting the subject of the action, and thereby tending to render a resulting judgment ineffectual.” (CPLR 1333.) In tacit acknowledgment that his papers failed to make this showing, the plaintiff, after the initial oral argument, withdrew this branch of the relief requested.

. The introductory clause to this subdivision technically renders it unavailable to defendant Clifford because the provisional remedy of attach *338 ment is not yet in effect. A TRO is not included in the list of provisional remedies appearing in CPLR 1312 (1). Nevertheless, this limitation has not been invoked by the plaintiff in opposition and, in the posture of this litigation, with the TRO accomplishing the same result as the attachment, it would be unjust for the court to do so. Consideration is merited by the Legislature of a technical correction of the omission of a TRO from subdivision (4). (Cf., CPLR 1336,1316.)
A second observation is appropriate in this footnote. The affidavit and financial data of Mr. Clifford have been, with the consent of the plaintiff, supplied ex parte and under seal. The court will not obstruct the procedural path the parties have mapped, but CPLR 1312 (4) does not provide for it.

. To the extent these arguments pertained to Mr. Altman and the TRO of out-of-State assets of both defendants, the case has been altered since their memorandum of law was written. (See, nn 1, 4, supra.) Thus, $1.9 million of Clifford’s assets in Washington, D.C., or their equivalent amount in value, are available to him and none of Altman’s assets are under restraint subject to this action.

. "Proceeds of a crime” means "any property obtained through the commission of a felony * * * and includes any appreciation in value of such property.” (CPLR 1310 [2].) "Substituted proceeds” "means any property obtained by the sale or exchange of proceeds of a crime, and any gain realized by such sale or exchange.” (CPLR 1310 [3].)

. See, United States v Masters (924 F2d 1362, 1369-1370 [7th Cir 1991], cert denied — US —, 111 S Ct 2019 ["the proceeds to which the statute refers are net, not gross, revenues — profits, not sales, for only the former are gains”]); United States v Elliott (727 F Supp 1126, 1128-1129 [ND Ill 1989] [allowing a deduction for the direct costs, such as interest and commissions, of a securities transaction]); United States v Milicia (769 F Supp 877, 888 [ED Pa 1991]). Even the Federal cases plaintiff cites are to the same effect. (See, United States v Porcelli, 865 F2d 1352, 1365 [2d Cir 1989] ["(t)he Congressional aim guiding these forfeitures is to recover all of the racketeer’s ill-gotten gains but not to seize legitimately acquired property * * * These properties are hence forfeitable under section 1963 (a) (1) to the extent of the contribution from the offending companies, but not necessarily in their entirety”]; see also, United States v Lizza Indus., 775 F2d 492, 498-499 [2d Cir 1985], cert denied 475 US 1082 [1986].) These cases make the further point that the term "proceeds,” though ambiguous (Russello v United States, 464 US 16, 29, n 3), is broader than "profits.” (See, United States v Milicia, supra, at 888, n 29; United States v Elliott, supra, at 1128.) These observations undermine Clifford’s reliance on expressions that article 13-A was intended to take the "profit out of crime”. (E.g., People v Martinez, *343 151 Misc 2d 641, 644.) Manifestly, by taking all of the "proceeds”, the "profit” is swept up, too.

. (See, n 3, supra.) There is a strong legislative policy discerned in the linkage between CPLR 1311 (1) (a) and CPLR 1310 (5) to preserve assets of a criminal defendant for forfeiture in this jurisdiction after a New York conviction and to prevent their erosion by prosecutors elsewhere. In terms of the provisions for attorneys’ fees, CPLR 1311 (12) protects funds paid for representation "in connection with a civil, or criminal forfeiture proceeding or a related criminal matter.” CPLR 1312 (4) prescribes release of funds for representing "the defendant in the forfeiture proceeding or in a related criminal matter relating thereto.” These can likewise be read as limited to the New York proceedings although defendant Clifford has made a logical and persuasive argument showing the symbiotic relationship between the Federal and New York prosecutions and their quality of being inextricably interwoven. This was also recognized by the Appellate Division in Matter of Altman v Bradley (184 AD2d 131).

. See, CPLR 1311 (4) (d) for factors which may be considered.